# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **NEREIDA MENDEZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 04 C 4159** |
| | ) | |
| **PERLA DENTAL, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on the parties' post-trial motions. For the reasons stated below, we grant Plaintiff's motions and we deny Defendants' motions.

## BACKGROUND

Plaintiff Nereida Mendez ("Mendez") alleged in her complaint that she worked for Defendant Perla Dental ("Perla"). According to Mendez, during her employment she was subjected to verbal and physical sexual advances and other sexual harassment. Mendez contended that she complained to the management of Perla, but, management did not address her complaints. Mendez also asserted that Defendant Doctor Assam Ahmed ("Ahmed") and Defendant Doctor Waleed Dajani

directly participated in the harassment.  Mendez brought the instant action and included in her second amended complaint a claim alleging gender discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and a Title VII hostile work environment claim (Count I), a Title VII retaliation claim (Count II), assault and battery claims (Count III), intentional infliction of emotional distress ("IIED") claims (Count IV), a retaliatory discharge claim (Count V), a Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, claim (Count VI), and an Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.* claim (Count VII).

A jury trial began in this case on April 23, 2007, and on April 26, 2007, the jury delivered a verdict in favor of Mendez on all claims.  The jury awarded Mendez compensatory damages (excluding back pay and overtime) in the amount of $20,431.25, overtime damages in the amount of $6,750, and lost wages (for the Illinois Retaliatory Discharge claim only) in the amount of $4,000, for a total non-punitive damages award of $31,181.25.  The jury also awarded punitive damages of $500,000 for the Title VII harassment claim and $250,000 for the Title VII retaliation and Illinois retaliation claims.  The parties subsequently filed post-trial motions and briefs concerning the statutory damages cap.  On March 6, 2008, this case was reassigned to the undersigned judge.

**DISCUSSION**

Mendez has filed a motion for liquidated damages pursuant to the provisions of the FLSA. The parties have also filed briefs regarding Title VII statutory damages caps. Defendants have filed a motion to reduce the $250,000 punitive damage award based on retaliatory discharge, and Defendants have filed a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 ("Rule 50") on the intentional infliction of emotional distress claims.

I. Liquidated Damages Under the Fair Labor Standards Act

Mendez filed a post-trial motion for liquidated damages in the amount of $13,500 under the FLSA. Defendants argue that the liquidated damages award, if granted, should equal $6,750. The FLSA provides that employers who violate overtime regulations "shall be liable to the employee or employees affected in the amount of . . . their unpaid overtime compensation . . . and in an additional equal amount as liquidated damages." 29 U.S.C § 216(b). Liquidated damages are awarded unless the court determines that "the employer show[ed] . . . that [the violation] was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act." 29 U.S.C § 260.

In the instant action, the jury found that Mendez worked 500 overtime hours between April 27, 2002, and April 2, 2003, for which Defendants failed to compensate her appropriately. Additionally, the jury found that Defendants either "knew or showed reckless disregard [regarding] whether their failure to pay overtime to Plaintiff Nereida Mendez was a violation of the law." (DE 164, Ex. 1 at 7). Since the jury found that Defendants failed to properly compensate Mendez for her overtime work, and since the jury explicitly rejected the notion that Defendants exercised good faith and had reasonable belief regarding their compensation of Mendez for overtime, Mendez should receive $6,750 in liquidated damages, an amount equal to the overtime the jury found she should have been paid.

We note that Mendez requests that the court grant $13,500 in liquidated damages, which is double the amount the jury decided Mendez was entitled to based on non-payment of overtime. Defendants point out that the liquidated damages award should be equal to the unpaid overtime compensation, as outlined in 29 U.S.C. § 216(b), not double that amount, as Mendez requests in her motion. However, it appears that the terminology used by Mendez in the initial request was confusing and Mendez has clarified in her Reply that she requests "double damages in the amount of $13,500, an[] additional $6,750.00 in addition to the $6,750.00 awarded by the jury. . . ." (DE 175 Par. 3). Therefore, we grant Mendez's motion for liquidated

damages under the FLSA and award Mendez $6,750 in liquidated damages.

## II.  Title VII Statutory Damages Caps

The parties have filed briefs regarding the statutory damages caps for Title VII claims.  Title VII limits the sum of compensatory and punitive damages that a plaintiff may be awarded under the statute.  42 U.S.C. § 1981a(b)(3); *EEOC v. Custom Companies, Inc.*, 2007 WL 734395, at *8 (N.D. Ill. 2007).  In the instant action, the jury awarded Mendez $20,431.25 in compensatory damages (excluding back pay and overtime) and $500,000 in punitive damages on her Title VII sexual harassment claim.  The jury verdict form indicates that the jury awarded $20,431.25 in compensatory damages, excluding back pay and overtime.  The verdict form did not give the jury the option to indicate what parts of the compensatory award were for which claims.  For example, the jury could not indicate how much of the $20,431.25 was for harassment, specifically.  The parties agree that Title VII's statutory damages caps will limit this award, but disagree on the limitation amount.

Pursuant to 42 U.S.C. § 1981a(b)(3) ("Section 1981a(b)(3)"):

The sum of the amount of compensatory damages awarded . . . for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party – A) in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current

or preceding calendar year, $50,000; (B) in the case of a respondent who has more than 100 and fewer than 201 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $100,000; . . . .

*Id.* Thus, if Perla had 100 or fewer employees in the relevant time period, Mendez's Title VII compensatory and punitive damages will be capped at $50,000. If Perla had 101 to 200 employees, Mendez's Title VII compensatory and punitive damages will be capped at $100,000.

A. Relevant Time Period

Section 1981a(b)(3) directs a court to consider the number of persons employed by a defendant "in the current or preceding year." *Id.* It is undisputed that Mendez worked for Perla from April 2002 to April 2003. (DE 157 at 2; DE 164 at 2). However, the parties disagree about what the resulting relevant time period is under Section 1981a(b)(3). Mendez claims that the determinative time period is April 2002 to April 2003, the period during which Defendants discriminated against Mendez. Defendants claim that the relevant time period extends from the beginning of 2002 to the end of 2003. (DE 157 at 2).

In *Komorowski v. Townline Mini-Mart & Restaurant*, 162 F.3d 962 (7th Cir. 1998), the Seventh Circuit, in considering the phrase "current calendar year" in 42 U.S.C. § 2000e(b), determined that the phrase refers to the year in which the alleged

discrimination occurred and the year preceding it. *Id.* at 966. Since 42 U.S.C. § 2000e(b) and Section 1981a(b)(3) have similar wording regarding the relevant time period, we conclude that the Seventh Circuit would give the same construction to Section 1981a(b)(3) as it gave to 42 U.S.C. § 2000e(b). *See Menchaca v. American Medical Response of Illinois, Inc.*, 2002 WL 48073, at *7 (N.D. Ill. 2002) (concluding that the Seventh Circuit would give the same construction as in *Komorowski*). Thus, the relevant time period for punitive damages under Section 1981a(b)(3) is the year of the alleged violation and the previous calendar year.

In the instant action, Mendez alleged that she was unlawfully harassed beginning in June 2002 and continuing through April 2003. (DE 28 Par. 16). Thus, the time period relevant to determining punitive damage caps is the years in which the violations occurred, 2002 and 2003, and the preceding year, 2001.

### B. Burden of Proof

Mendez and Defendants dispute who has the burden of proving how many employees Perla had during the statutory period under Section 1981a(b)(3). Defendants argue that Mendez has the burden of proving the number of people Perla employed during the relevant time period. To support their contention, Defendants cite *Ost v. West Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 439 (7th Cir.

1996) and *Wilson v. Comtrust LLC*, 249 F. Supp. 2d 993, 997 (N.D. Ill. 2003). (DE

157 at 3-4). However, both *Ost* and *Wilson* turned on the issue of whether

defendants were "employers" within the definition of Title VII, an essential threshold

element of a Title VII claim on which the plaintiff carries the burden of proof. 88

F.3d at 439-40; 249 F. Supp. 2d at 994-95. However, the issue now before the court

relates to the number of people employed by Defendants for the purpose of damages

caps, which is not an element of Mendez's Title VII claim. At the post-trial stage, by

way of contrast, there is no similarly delineated burden. A much more persuasive

analogy is made by reviewing cases regarding a defendant's burden to produce

evidence of net worth in order to minimize punitive damages. In *Kemezy v. Peters*, 79

F.3d 33 (7th Cir. 1996), the Seventh Circuit held that in a Section 1983 action, the

defendant bears the burden of establishing his net worth when defending against a

claim involving punitive damages. *Id.* at 36. While this case differs from *Kemezy*

because Section 1981a(b)(3) caps are determined by the judge after a verdict is

rendered rather than by the jury, the holding of *Kemezy* is nonetheless instructive. As

Mendez correctly observes, "[i]f the defendant bears the burden of showing its net

worth in hopes of avoiding a large punitive damages award, then logically it is also

incumbent upon the defendant to show how many employees it has when attempting to

obtain a lower damages cap." (DE 169 at 6). Net worth and the number of

employees serve the same purpose in the uncapped punitive damage case and the Title VII capped case. They both relate to a defendant's ability or obligation to pay the award based upon a defendant's net worth or number of employees. The principles articulated by the Seventh Circuit in *Kemezy* with regard to a defendant's burden to show net worth thus weigh in favor of placing the burden of proof regarding the number of employees on Defendants.

In addition, it is reasonable to place the burden of establishing the number of employees on Defendants since normally a defendant employer is in a better position to provide information regarding its employees. *See, e.g., Kemezy*, 79 F.3d at 36 (stating that "[s]ince . . . information about net worth is in the possession of the person whose net wealth is in issue, the normal principles of pleading would put the burden of production on the defendant"). Thus, we conclude that Defendants bear the burden of proof in establishing the number of employees of Perla during the relevant time period.

C. Evidence Concerning Number of Employees

There is conflicting evidence with regard to how many persons Perla employed during the relevant time period. There is a dispute between the parties whether this information should have been obtained during discovery.

The evidence reflects that Perla's general manager, Milan Roncevic ("Roncevic"), and Perla's manager Rawaa Attar ("Attar"), during their depositions were asked as to the number of employees the company employed during the years 2001, 2002, and 2003, and both of these managers' answers were evasive and contained uncertain words such as "not sure," and "maybe." (DE 168, Ex. D at 149); (*Id.*, Ex. D at 149-50); (*Id.*, Ex. E at 15-16). Defendants point out that Nedal Abed ("Abed"), who was Perla's Rule 30(b)(6) designee, testified in his deposition that between fifty and one hundred employees attended the company Christmas party in 2002. (DE 168, Ex. C at 76). According to Mendez, Abed testified in his deposition that Perla had nine locations each employing twelve employees, which totals 108 employees. (DE 164 at 6).

Mendez also supports her assertion that Defendants had over 100 employees with the deposition testimony of Dr. Husam Aldairi ("Aldairi"), Perla's sole owner and shareholder. (DE 164 at 4). During his 2005 deposition, Aldairi, in response to a question relating to an employee, testified as follows: "I have so many people that work, came and left. I have 90 to 100, 120 employees, ma'am. If you want to tell me I need to remember each one of them in the last six years, multiply that by another 100. I cannot remember these people. . . . ." (DE 157, Ex. A at 189). For the sake of clarity, we point out that Abed testified regarding how many employees worked at

the 26th Street clinic. Although Abed did not give an exact number of employees at each of Perla's locations, he did testify that Perla had nine locations each employing twelve employees, which totals 108 employees. (DE 164 at 6); (DE 164, Ex. 4 at 6-7).

Defendants have produced no conclusive evidence regarding how many people they employed during the statutory period, and Defendants' answers have been evasive, despite the fact that they should possess such records. It is reasonable to expect that a company's general manager, manager, and the owner, would each have knowledge regarding the number of employees in their company. Based on the evidence presented, and Defendants' conspicuous failure to provide conclusive information or documentation, we conclude that Defendants have failed to carry their burden. Defendants have not shown that damages should be reduced to $50,000, the lower of the two possible caps. Based on the record before us, we find that Defendants have been evasive as to the number of employees in their company during 2001, 2002, and 2003, and we conclude that the proper statutory damages cap is $100,000, the damages cap appropriate for an employer that has between 101 and 200 employees. Even if the burden of proof is not on Defendants in this regard, this conclusion is supported by the deposition testimony of Aldairi, the sole owner and shareholder of Perla, that the company employed over 100 employees at one time, and the testimony

of Abed, Perla's Rule 30(b)(6) designee, that the company employed 108 employees,
and that up to 100 of those employees attended the company's Christmas party in
2002, during the relevant period in this action.

On a final note, neither party has addressed the proper apportionment of the
statutorily reduced award, such as whether the cap should reduce the compensatory or
punitive damages. In *Lust v. Sealy, Inc.*, 383 F.3d 580, 589 (7th Cir. 2004), the
Seventh Circuit stated that, in apportioning damages under a Title VII cap, "the
sensible thing for the judge to do is not to make a pro rata reduction . . . but instead to
determine the maximum reasonable award of compensatory damages, subtract that
from [the applicable statutorily capped amount], and denote the difference in punitive
damages." *Id.*; *see also Custom Companies*, 2007 WL 734395, at *8 (stating that
"the preferred method for reducing awards is to leave compensatory damages intact
and lower punitive damages as necessary to bring the total under the cap (rather than
reducing the compensatory damages or reducing both *pro rata*)"). Neither party has
challenged the reasonableness of the jury's compensatory damages award. Thus, even
though the jury awarded $20,431.25 in compensatory damages and $500,000 in
punitive damages, the ultimate cap is $100,000 for Title VII compensatory and
punitive damages, and we denote the amount exceeding the jury's $20,431.25

compensatory damages award, which results in $79,568.75, as punitive damages, totaling $100,000.

III.  Constitutional Caps on Punitive Damages

Defendants argue that the punitive damages awarded to Mendez are excessive. As stated above, the jury found in Mendez's favor on all claims and awarded Mendez $20,431.25 in compensatory damages (not including back pay or overtime), $6,750 in unpaid overtime, and $4,000 in lost wages for Illinois retaliatory discharge, for a total non-punitive damages of $31,181.25.  The jury also awarded Mendez $500,000 in punitive damages for Title VII sexual harassment, and $250,000 in punitive damages for retaliatory discharge under both Title VII retaliation and Illinois retaliation law.  Title VII's damages cap will reduce the sum of the compensatory damages and the $500,000 punitive damages award for harassment to $100,000.  42 U.S.C. 1981a(b)(3).  However, the parties agree that the Title VII damages cap does not apply to the $250,000 punitive damages award, because, as the jury verdict form indicates, the $250,000 punitive award was made on the basis of both Title VII retaliation and Illinois retaliation law.  (DE 156 at 2; DE 164, Ex. 1 at 8).

Defendants move to either "(a) reduce the total punitive damages awarded to $75,000 because the awards, even after application of the Title VII damage cap, 42

U.S.C. § 1981a(b)(3), are unconstitutionally large, or (b) direct that total punitive damages be remitted to $75,000, and order a new trial if Mendez refuses to agree to the reduced award."  (DE 155 at 1).  Although Defendants ostensibly request a reduction in the "total punitive damages," Defendants have focused their arguments for reduction on the $250,000 retaliation award.  In any event, Defendants have not provided any justification or arguments relating to reduction in punitive damages other than the $250,000 retaliation award, and therefore, we deny the Defendants' generalized request.  We will address below Defendants' request for reduction of the punitive damages award of $250,000 relating to the retaliation claims.

Defendants request that the court reduce the $250,000 punitive award relating to retaliation to $75,000, which is roughly three times the compensatory award. Although the "primary responsibility for deciding the appropriate amount[] of [punitive] damages rests with the jury," *EEOC v. AIC Security Investigations, Ltd.*, 55 F.3d 1276, 1287 (7th Cir. 1995), the Court has a duty to review the size of punitive awards.  *See Honda Motor Co., Ltd. v. Oberg*, 512 U.S. 415, 432 (1994)(emphasizing the importance of judicial review in preventing unjust punitive awards).  The Supreme Court has established three "guideposts" to assist courts in determining whether punitive damages are constitutionally excessive: (1) the "degree of reprehensibility" of the defendant's improper conduct; (2) the "disparity between

the harm or potential harm suffered by [the plaintiff] and [the] punitive damages award;" and (3) the difference between the punitive damages and the civil penalties authorized or imposed in comparable cases. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996); *see also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003)(reiterating *Gore*'s three guideposts).

A.  Reprehensibility of Conduct

The first and "most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575.  The Supreme Court has instructed courts to determine the reprehensibility of a defendant's conduct by considering whether "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm*, 538 U.S. at 418 (citing *Gore*, 517 U.S. at 576-77).  The Supreme Court has further counseled that "[t]he existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Id.*

We note that, for the purposes of this inquiry, only Defendants' conduct in retaliating against Mendez is relevant, as only that particular punitive award is being considered here.  Defendants contend that there was "very little or no reprehensible conduct related to the decision to discharge [Mendez]."  (DE 156 at 4).  However, Mendez counters that "Aldairi's behavior was very reprehensible, because instead of doing what was required under the circumstances, *i.e.*, promptly addressing his employees' harassing behavior and helping [Mendez,] he did the opposite – he fired [Mendez]."  (DE 172 at 9).  Mendez points to evidence not directly contradicted by Defendants, (DE 182 at 3), that Aldairi screamed and used profanities toward Mendez in the termination meeting, (DE 172 at 10), that Aldairi suggested to other employees that Mendez might blow up a building, *id.*, and that Aldairi had a manager meet with Mendez after her termination and tell her that she should drop her EEOC charge.  *Id.*  There was evidence that this manager warned Mendez that Aldairi was a "very powerful man."  *Id.*  Finally, Mendez points out that "even after Mendez filed her EEOC charge and even after the EEOC made a finding of substantial evidence in her favor, Defendants did absolutely nothing to correct the problem or discipline any of the offending doctors."  *Id.*

The evidence set forth by Mendez supports the conclusion that Defendants' conduct was reprehensible.  Although Defendants' act of retaliation, that is to say,

Mendez's termination, did not involve physical harm of a bodily injury nature, the conduct was not an isolated act of a routine termination notice. It involved a series of deliberate reprehensible acts. Evidence was introduced that during the termination Aldairi screamed and used profanities and subsequently suggested to other employees that Mendez might blow up the building. Informing other employees that Mendez might blow up the building could have resulted in injury to Mendez and created safety problems to other employees due to panic. This was even more reprehensible as it was coming from the owner of a company that employees would have a tendency to believe more than if it was coming from a lower level employee of the company. In addition, evidence was produced that showed that Aldairi caused a manager to meet with Mendez soon after her termination to intimidate her to drop her EEOC charge. Defendants' conduct was unquestionably illegal and objectionable. In the instant action, the degree of reprehensibility evidenced in the record certainly justifies the award of punitive damages. Based on the record, we cannot conclude that a $250,000 punitive award is disproportional to the reprehensibility of the conduct here. Defendants argue that "there is a very real possibility that the jury awarded punitive damages to punish defendants for acts other than retaliatory discharge," such as not paying overtime. (DE 156 at 4). It is true that the Supreme Court has held that "[a] defendant's dissimilar acts, independent

from the acts upon which liability was premised, may not serve as the basis for punitive damages." *State Farm*, 538 U.S. at 422. However, Defendants' argument that the punitive award here was based on such extraneous conduct appears to be based purely on speculation. (DE 156 at 4).

## B. Ratio Between Compensatory and Punitive Damages

The punitive award by the jury in this case is approximately 10 times the compensatory award, and approximately 8 times the total non-punitive damages award. The Supreme Court teaches that no "mathematical bright line" test exists to determine whether an award is impermissibly excessive. *Gore*, 517 U.S. at 560; *State Farm*, 538 U.S. at 425 (stating that the court "decline[s] again to impose a bright-line ratio which a punitive damages award cannot exceed"). As noted above, the jury awarded $20,431.25 in compensatory damages, an additional $4,000 in lost wages, and an additional amount of $6,750 in overtime. The jury also awarded $250,000 in punitive damages for retaliatory discharge.

The Supreme Court and Seventh Circuit have both recognized that high ratios are less alarming when compensatory damages are small. *State Farm*, 538 U.S. at 425; *Alexander v. City of Milwaukee*, 474 F.3d 437, 454 (7th Cir. 2007)(indicating that "greater punitive damages ratios may comport with due process" when

compensatory damages "are relatively low"). However, in this case, Mendez was awarded $20,431.25 in compensatory damages for retaliation, which is not a significant amount. There was ample evidence presented that showed reprehensible behavior by Defendants, and Defendants have not provided justification for a reduction of the punitive damages award based on the ratio.

C. Civil Penalties in Comparable Cases

The third *Gore* guidepost requires the Court to consider the difference between the punitive damages awarded here and the civil penalties authorized or imposed in comparable cases. *Gore*, 517 U.S. at 583. The first and most obvious comparator is Title VII damage caps. 42 U.S.C. § 1981a(b)(3). As stated above, and as the parties acknowledge, the jury's award of $250,000 to Mendez for retaliation under Title VII and Illinois law is not subject to Title VII damages caps, as the award does not fall solely under Title VII. However, as Mendez's cause of action for retaliation falls partly under Title VII, those caps provide a relevant comparison.

In this case, as discussed above, the appropriate Title VII statutory cap is $100,000. Thus, the jury's punitive award for retaliation is only 2.5 times as large as the Title VII cap would allow. There certainly is no requirement that an award made partially under state law conform to Title VII caps. The Defendants' behavior here

was indeed shameful. In addition, this behavior was exhibited and tolerated by individuals with authority over a victim who was susceptible. An award by the jury, who heard and considered the evidence, of ten times the compensatory award, under the facts of this case is not unreasonable. We note that there are three cases in which the Seventh Circuit has upheld punitive ratios far higher than the one the jury awarded in this case. *See, e.g.*, *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672, 678 (7th Cir. 2003)(upholding ratio of approximately 37:1 where compensatory award was $5,000); *Fine v. Ryan Intern. Airlines*, 305 F.3d 746, 756-57 (7th Cir. 2002) (upholding ratio of 49:1 where compensatory damages were $6,000); *Shea v. Galaxie Lumber & Const. Co., Ltd.*, 152 F.3d 729, 736 (7th Cir. 1998)(upholding punitive award of $2,500 where compensatory damages were $1.00). The retaliatory conduct in this case is certainly illegal and blameworthy, and the punitive damages award by the jury as to this conduct is not unreasonable.

### D. Appropriate Award

The punitive damages of $250,000 for retaliation awarded by the jury balances deterrence and condemnation of Defendants' conduct with an appropriate concern for proportionality in light of the facts in this case. We are mindful that Defendants have urged the court to reduce the punitive damages to $75,000, approximately only

three times the compensatory award. While certain courts have found a punitive award of three times the compensatory damages to be a suitable punitive award, *see, e.g.*, *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 483, 485 (7th Cir. 2003); *David v. Caterpillar, Inc.*, 185 F.Supp.2d 918, 926-27 (C.D. Ill. 2002), in this case, we conclude that the Defendants have not justified the reduction of the jury's punitive award to $75,000. Defendants' proposed award would be too low to have the intended deterrent effect on Defendants. Perla is a large business. Aldairi testified that Perla's gross revenues were between one and ten million dollars. (DE 172 at 3). An award of only $75,000 is unlikely to inculcate upon Defendants the necessity of curbing retaliatory behavior, and based on the record, the court declines to reduce the jury's award. The punitive damages award of $250,000 by the jury preserves the strong deterrent value of the award and is far below the other ratios of 37/1, 49/1, and 2,500/1 that have been upheld by the Seventh Circuit. *Mathias*, 347 F.3d at 678; *Fine*, 305 F.3d at 756-57; *Shea*, 152 F.3d at 736. Therefore, we deny Defendants' motion to reduce the jury's punitive damages award.


IV.  Intentional Infliction of Emotional Distress Claims

At the close of Mendez's case at trial, which was also the close of evidence in the case, Defendants presented a motion for judgment as a matter of law on

Mendez's IIED claims.  The court heard brief oral arguments and stated that it would reserve its ruling until the jury had delivered its verdict.  As stated above, the jury returned a verdict in favor of Mendez on all counts.

A.  Rule 50 Renewal Issue

Mendez claims that Defendants have failed to properly present their motion for judgment as a matter of law.  Specifically, Mendez argues that the Federal Rules of Civil Procedure required Defendants to renew their Rule 50(a) motion by filing a Rule 50(b) motion.  Defendants presented a motion for judgment as a matter of law at the close of Mendez's evidence, which was also the close of evidence in the case. The close of Mendez's case was the close of all evidence because Defendants did not put on any additional evidence after Mendez concluded her case.  (DE 183 at 1-2). The court heard brief oral arguments from the parties and then reserved ruling until after the jury verdict.  Defendants did not renew their motion under Rule 50(b), but Defendants did state, in a footnote to their Motion to Reduce the Jury's Award of Punitive Damages filed after the verdict, that their motion for judgment as a matter of law on the IIED claim was "still pending," and "respectfully request[ed] that the Court grant their motion."  (DE 156 at 1 n.1).  In this case, Defendants made their motion at the close of all the evidence.  Thus, Mendez had an opportunity to cure any

deficiencies in her case when Defendants made their original motion, an opportunity which fulfilled the purpose of the rule. *Laborers' Pension Fund v. A & C Environmental, Inc.*, 301 F.3d 768, 777 (7th Cir. 2002)(stating that "the rationale that animates the need to renew the motion at the close of all evidence [is] to permit the nonmoving party to cure the defect in its case").

In addition, where, as here, the district court reserved its ruling on the original motion, the plaintiff is on notice that judgment as a matter of law is still a live issue and the rationale for the renewal rule, allowing the nonmoving party an opportunity to cure their claim's deficiencies, again collapses. *Szmaj v. American Tel. & Tel. Co.*, 291 F.3d 955, 958 (7th Cir. 2002). Where the district court makes known that the issue is still alive, "[t]here is no mousetrapping of the plaintiff . . . and requiring a party to file a [renewal] motion before a previous identical motion has been ruled on is wasteful." *Id.* (noting that "[t]he case law overwhelmingly denies that failure to renew in this circumstance [where the district court took the original motion under advisement] is inexcusable"). Since Defendants brought their original motion for judgment as a matter of law at the close of all the evidence, and the court specifically reserved ruling on this issue after the close of evidence, we conclude that the purpose of Rule 50(b) has been satisfied and we will consider the merits of Defendants' motion.

23

B.  Legal Standard

The court may grant a motion for judgment as a matter of law filed by a party only when there is no "legally sufficient evidentiary basis for a reasonable jury to find for the [opposing side] on that issue. . . ." Fed. R. Civ. P. 50(a)(1).  In reviewing a motion for judgment as a matter of law, a court "does not reweigh the evidence presented at trial or make credibility determinations." *Joyce v. Chicago Park Dist.*, 483 F. Supp. 2d 678, 682-83 (N.D. Ill. 2007)(citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).  Rather, the court examines the record as a whole and determines whether the evidence, combined with all reasonable inferences permissibly drawn therefrom, was sufficient to support the jury verdict.  *Hossack v. Floor Covering Assoc. of Joliet, Inc.*, 492 F.3d 853, 859 (7th Cir. 2007).  In addition, "[a]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury [i]s not required to believe." *Reeves*, 530 U.S. at 151 (stating that "the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses");  *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 605 (7th Cir. 2006)(indicating that the court should view the evidence in the light most

favorable to the non-moving party and draw all reasonable inferences in that party's favor).  Rule 50 imposes a "high standard for overturning a jury verdict," and judgment as a matter of law is not appropriate unless the court determines that no reasonable jury could have returned that verdict.  *Pierson v. Hartley*, 391 F.3d 898, 903-904 (7th Cir. 2004)(reversing the district court's entry of judgment as a matter of law and directing reinstatement of the jury's verdict).

### C.  Relevant Facts

The parties have filed briefs relating to the following facts presented at trial. Mendez presented evidence at trial that Defendants created and maintained an environment in which its employees engaged in ongoing verbal and physical sexual harassment, repeatedly refused to correct the harassment, and ultimately terminated Mendez in retaliation for her complaints of harassment.  (DE 173 at 5-6, 10).  Otilia Barcenas ("Barcenas"), a dental assistant who worked with Mendez, testified that a dentist threw her out of a room where she was treating a patient, yelling his preference for a male technician.  (*Id.* at 6).  When Barcenas complained to Roncevic, the Defendants' office manager, Roncevic replied that he "[didn't] give a sh__" and directed Barcenas "to kiss [the dentist's] a___ because he is a doctor, or else [Barcenas] will be fired."  (*Id*).  Similarly, when Mendez complained to

Roncevic after one of the dentists grabbed Mendez's buttocks, Roncevic responded by laughing and saying "You know Dr. Ahmed, he's freaky like that." (*Id.* at 11). When Mendez complained to Attar, Aldairi's wife and Perla's general manager, about the harassment, Attar responded by telling Mendez "I can replace you and I would do so before I would replace any of my doctors." (*Id.* at 11). Zoran Zivkovic ("Zivkovic"), the assistant office manager, testified that Mendez complained to him on numerous occasions about the harassment she was enduring and that he in turn reported it to Roncevic, but nothing was done. (*Id*). Zivkovic offered to speak to the dentists, but he was told not to speak to them, and eventually gave up complaining because he received no response. (*Id*).

During the trial, testimony was presented that dentists often stated that women were stupid and lazy, that they were idiots, that they should be at home barefoot and pregnant, that they were inferior to men, that they existed only to please men, and that they did not belong in the workplace. (*Id.* at 6). Testimony was also presented that the dentists made frequent comments to Mendez and her co-workers about female patients. (*Id*). Testimony indicated, for example, that Ahmed discussed the attributes of female patients' body parts. (*Id*). He also told Mendez he "purposely tilted the seat back further so that [he] could look at [a patient's] breast" while she was being treated. (*Id*). There was evidence that one dentist made a comment about

the sexual experience of a young female patient, and what he would do to her if he were to engage in relations with her.  (*Id*).  Testimony indicated that Defendants did nothing to deter dentists from making such offensive comments to Mendez and her co-workers.  (*Id*).  When Mendez complained about the sexual harassment, she was criticized and ridiculed in front of other employees.  (*Id.* at 9).  Mendez testified that one of Defendants' dentists shoved her and caused her injury.  (*Id.* at 7).  However, Mendez did not press charges against the dentist for fear of reprisal at work.  (*Id.* at 7).  Mendez was terminated by Defendants after this injury occurred.  (*Id*).

Aldairi was Perla's owner and sole shareholder, who was ultimately responsible for all employment decisions.  (*Id.* at 5).  There was testimony that when Aldairi terminated Mendez, he flew into a rage and shouted at Mendez, saying, "[w]ho the f___ do you think you are bringing me this hospital bill?" and "[d]on't even try to collect unemployment compensation, because I will tell them you don't deserve sh__!"  (*Id.* at 8).  Testimony was presented that following Mendez's termination, Aldairi made negative comments about Mendez in front of her co-workers and peers.  (*Id.* at 9).  Specifically, Aldairi told other staff members that Mendez had been terminated for threatening to blow up the building and that she was crazy.  (*Id.* at 14).

Testimony was presented about Mendez's susceptibility to emotional distress. Mendez testified that she was only nineteen when Defendants hired her and she began to be sexually harassed. (*Id.* at 8). Mendez alleges that the vast age difference between her and the dentists who harassed her, and Aldairi, who threatened her and terminated her, rendered her more susceptible to emotional distress than an older employee who would be better equipped to handle abuse inflicted by other adults. (*Id*). There was also evidence that Mendez had been on her own since the age of fourteen and that "she felt the need for her job very acutely." (*Id.* at 8). Finally, Mendez stated that being shoved by one of the dentists made her more susceptible to emotional distress. (*Id*. at 7). Mendez claims that Defendants knew of these susceptibilities. (*Id.* at 7-8).

Mendez attested to the severity of her emotional distress by stating that the harassment and termination she suffered caused her to withdraw and avoid any socialization with her friends. (*Id.* at 14). She further testified that she dropped out of school as a result of the trauma she experienced and that she could not summon the strength to return until years later. (*Id*). Mendez testified that she was humiliated by Aldairi's statements to other staff members and that she was frightened by the situation she found herself in as a result of Defendants' conduct. (*Id*). According to testimony at trial, Mendez "spiraled into depression" and began to believe some of

the degrading things about herself that she had constantly heard from Defendants and the dentists. (*Id*). However, Mendez did not seek any medical or psychological treatment for her emotional injuries. (*Id.* at 13-14).

## D. Discussion

To prevail on a claim of intentional infliction of emotional distress in Illinois, a plaintiff needs to prove that: "(1) the defendant's conduct was extreme and outrageous, (2) the defendant either intended to inflict severe emotional distress or knew that there was at least a high probability that his conduct would inflict severe emotional distress, and (3) the defendant's conduct did cause severe emotional distress. *Naeem*, 444 F.3d at 605; *Welsh v. Commonwealth Edison Co.*, 713 N.E.2d 679, 683 (Ill. App. Ct. 1999)(citing *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988)).

## 1. Extreme and Outrageous Conduct by Defendants

Defendants argue that their behavior was not extreme and outrageous. A determination of whether "conduct is extreme and outrageous is judged on an objective standard." *Welsh*, 713 N.E.2d at 683; *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993). Liability attaches to circumstances in which a

defendant's conduct is "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.'"  *Welsh*, 713 N.E.2d at 683 (quoting *Pub. Fin. Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill. 1976))(further internal quotation marks omitted)).  Liability does not extend to "'mere insults, indignities, threats, annoyances, petty oppressions or trivialities.'"  *Id.* (quoting *Pub. Fin. Corp.*, 360 N.E.2d at 767).

In *Honaker v. Smith*, 256 F.3d 477 (7th Cir. 2001), the Seventh Circuit summarized several non-exclusive factors that Illinois courts have considered in determining the outrageousness of a defendant's conduct.  *Id.* at 490-92; *see also Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858, 866-67 (Ill. App. Ct. 2000)(describing factors).  First, the court should consider "the degree of power or authority which a defendant has over a plaintiff. . . ."  *Honaker*, 256 F.3d at 490-91 (stating that the "more control which a defendant has over the plaintiff, the more likely that defendant's conduct will be deemed outrageous, particularly when the alleged conduct involves either a veiled or explicit threat to exercise such authority or power to the plaintiff's detriment").  In examining this factor, it is proper to consider not only the power wielded by the defendant, but also the likelihood that the threatened action could be actually taken.  *Id.* (citations omitted).

Another factor that should be considered by a court in determining whether

conduct is extreme and outrageous is "whether the defendant reasonably believed that his objective was legitimate. . . ."  *Honaker*, 256 F.3d at 491 (stating that "greater latitude is given to a defendant pursuing a reasonable objective even if that pursuit results in some amount of distress for a plaintiff").  Finally, a court in assessing whether conduct is extreme and outrageous should consider whether the plaintiff is particularly susceptible to emotional distress because of some physical or mental condition.  *Honaker*, 256 F.3d at 492 (stating that "behavior that otherwise might be considered merely rude, abrasive or inconsiderate may be deemed outrageous if the defendant knows that the plaintiff is particularly susceptible to emotional turmoil").

In the instant action, there was evidence of highly objectionable behavior on Defendants' part.  Mendez presented evidence that the dentists, who were in a position to influence employment decisions regarding Mendez, harassed and demeaned Mendez and her female co-workers.  (DE 173 at 5, 6, 9).  Testimony indicated that the dentists said women were stupid and lazy, that they were idiots, that they should be at home barefoot and pregnant, that they were inferior to men, that they existed only to please men, and that they did not belong in the workplace.  (*Id.* at 6).  The evidence indicated that the dentists made offensive sexual comments about female patients, as stated above.  The dentists' conduct also included physical

harassment of Mendez. (*Id.* at 11). One of the dentists grabbed Mendez's buttocks. (*Id.* at 11). When Mendez complained about the inappropriate touching, Roncevic laughed and dismissed her complaint, saying, "[y]ou know Dr. Ahmed, he's freaky like that." (*Id*). When one of Mendez's female colleagues complained to Roncevic, he reportedly said he "[didn't] give a sh__" and directed her to "kiss [the dentists'] ass because he is a doctor, or else [she would] be fired." (*Id.* at 6). Mendez's complaints to Attar, Perla's general manager, were similarly unavailing. Attar told Mendez that she would replace Mendez before she would replace any of her doctors. (*Id.* at 11). Mendez was shoved and groped by the dentists. (*Id.* at 7, 11). Mendez also presented evidence that Defendants did nothing to deter the dentists' conduct or otherwise respond to Mendez's complaints. (*Id.* at 5-6). Aldairi screamed and swore at Mendez when he fired her, and later told her co-worker that she was crazy and had threatened to blow up the building. (DE 173 at 8, 14). Mendez also presented evidence that Aldairi had attempted to intimidate Mendez so that she would refrain from filing an EEOC charge. (*Id.* at 5).

a. Degree of Power

Based upon the above evidence, there is evidence that Perla's supervisory employees held a significant degree of power over Mendez and abused their positions

of power.  *See Honaker*, 256 F.3d at 491 (stating that the "more control which a defendant has over the plaintiff, the more likely that defendant's conduct will be deemed outrageous").  Aldairi, the owner of Perla, failed to respond to Mendez's complaints and abused her verbally when he terminated her.  (DE 173 at 5, 8).  Roncevic and Attar, managers at Perla, dismissed Mendez's complaints and Roncevic, at least, displayed a dismissive attitude about the dentists' behavior.  (*Id.* at 6, 11).  The dentists, who could influence employment decisions affecting Mendez, were likewise able to use their positions to harass and demean Mendez and her female colleagues with impunity.  (*Id.* at 5-6).  When viewed in the light most favorable to Mendez, we agree with Mendez that it was reasonable for the jury to infer that Perla's owner Aldairi, and managers, Attar, and Roncevic, in particular, knew that Mendez and her co-workers were fearful of losing their jobs and allowed the dentists' harassment and intimidation to continue specifically to wrest total obedience and an uncompensated amount of work from their staff.  *See Patterson v. Xerox Corp.*, 901 F. Supp. 274, 279 (N.D. Ill. 1995)(stating that "persistent harassment from [one's superior] would be likely to have a more detrimental effect on [the plaintiff] than similar harassment from a co-worker or other acquaintance").

b.  Pursuit of Legitimate Goal

The next factor considered by *Honaker* is whether the defendants engaged in the conduct in question in pursuit of a legitimate goal.  256 F.3d at 491.  In the instant action, there is no indication that Defendants thought their abusive or dismissive conduct was in pursuit of a legitimate goal.  Creating and maintaining an environment where one's female employees are harassed, demeaned, shoved and groped could hardly be mistaken for a legitimate business purpose.  Moreover, Mendez presented some evidence indicating that Defendants knew their conduct was illegal.  Perla's manager told Mendez that she should drop her EEOC charge and warned her that Aldairi was a "very powerful man."  (DE 172 at 10).  Drawing all inferences in Mendez's favor, the jury could have reasonably concluded that Defendants knew their conduct was wrong, another factor weighing in favor of a finding of outrageousness.

c.  Susceptibility to Harassment

Finally, Mendez introduced evidence that she was particularly susceptible to Defendants' harassment.  *Honaker*, 256 F.3d at 492.  Mendez presented evidence that she had "been on her own to work and care for herself" since the age of fourteen, and that she was only nineteen years old when the harassment started at Defendants' facilities.  (DE 173 at 8).  She also stated that her "acute[]" need for her job made her

susceptible to harassment.  (*Id*).  The jury could have concluded, on the basis of these

factors, that Mendez was more susceptible to intimidation and unequipped to handle

the harassment from her older superiors.

The evidence in this case, such as the evidence described above, was sufficient

for the jury to conclude that Defendants' conduct was outrageous.  The evidence

supported findings that Perla's owner, managers, and certain employees abused their

positions of power to harass and intimidate Mendez, that Defendants knew, or at the

very least should have known, that their conduct was wrong, and that Mendez was

particularly susceptible to emotional distress.

When viewed in the aggregate, and when viewed in the light most favorable to

Mendez, the evidence clearly is sufficient to support the jury's verdict.  The evidence

supported findings that certain employees of Perla physically assaulted Mendez on

two occasions, that certain employees of Perla routinely degraded women by making

offensive and disgusting comments while on the job, that ownership and management

did nothing to deter certain employees from making such comments, that Perla's

owner terminated Mendez by screaming and swearing at her, that Perla's owner called

Mendez crazy and said that she would blow up the building, and that a member of

management attempted to dissuade Mendez from filing an EEOC claim through

intimidation at the request of Perla's owner.  Such conduct and acts exceeds mere

insults and trivialities and is indeed outrageous. *Honaker*, 256 F.3d at 491 (stating that outrageous conduct exists in the employment context when the employer "clearly abuses the power it holds over an employee in a manner far more severe than the typical disagreements or job-related stress caused by the average work environment")(collecting cases in appended footnote). Thus, the record clearly supports a conclusion that Defendants' conduct was reprehensible and outrageous and is the type of conduct that Title VII prohibits.

### 2. Intention to Inflict Distress or Knowledge of Possibility

The second element of IIED in Illinois requires a plaintiff to show that a defendant either intended to inflict severe emotional distress on the plaintiff or knew that there was a high probability that a defendant's conduct would do so. *Naeem*, 444 F.3d at 605. The courts, in general, have deemed "this element to be satisfied either when a defendant's actions, by their very nature, were likely to cause severe distress or when the defendant knew that a plaintiff was particularly susceptible to such distress and that, because of this susceptibility, the defendant's actions were likely to cause it to occur." *Honaker*, 256 F.3d at 494.

In the instant action, there was ample evidence that management knew about the harassment Mendez was enduring. (DE 173 at 6-7). There was also evidence, as

discussed above, that Defendants knew Mendez was particularly susceptible to emotional distress. (DE 173 at 7-8). The jury might well have concluded that the numerous acts of harassment, dismissiveness, and abuse committed by Defendants' management and employees brought with them the high probability of causing severe emotional distress. (DE 173 at 10-11). There was thus sufficient evidence that Defendants intended to cause Mendez severe distress or knew of the high probability that their conduct would cause severe distress.

### 3. Severe Emotional Distress

Finally, to prevail on her IIED claim, Mendez had to present sufficient evidence that showed that she suffered severe emotional distress. *Naeem*, 444 F.3d at 606. Defendants contend that, although Mendez "testified to some alleged emotional harm, . . . her only 'evidence' [of severe emotional distress] is her self-serving, unsupported testimony." (DE 183 at 8). It is true that Mendez did not put on any evidence that she sought medical treatment for, or exhibited physical symptoms of, her putative emotional distress. However, she testified that she was humiliated by the damage to her personal and professional reputation, that she was "frightened by the situation she found herself in as a result of Defendants' conduct," that she "spiraled into depression," and that she "began to believe some of the degrading things about

herself that she had constantly heard from Defendants and their dentists." (DE 173 at 14). She also testified that the harassment and termination caused her to avoid socialization and drop out of school. (*Id.* at 14).

While Illinois courts have found emotional distress severe when the distress manifests itself through physical symptoms or necessitates medical treatment, *see id.*, *Honaker*, 256 F.3d at 495 (collecting cases in appended footnote), the Seventh Circuit has held that neither a physical manifestation of distress nor the seeking of professional help is a necessary condition to finding that a plaintiff suffered from severe emotional distress. *Id.*; *Naeem*, 444 F.3d at 606 (citing *Bristow v. Drake Street, Inc.*, 41 F.3d 345, 350 (7th Cir. 1994)); *Bristow*, 41 F.3d at 349 (stating that "the plaintiff is not required to prove that the defendant's conduct provoked a physical reaction"). We conclude, based upon the record before us, that the jury could have reasonably found for Mendez on the severe emotional distress question. Mendez provided evidence of major disruptions in her life as a consequence of her emotional distress. She testified that because of her depression, she began avoiding socialization and dropped out of school. (DE 173 at 14). When viewed in the light most favorable to Mendez, this evidence shows emotional distress powerful enough to disrupt Mendez's social and professional life. Such evidence is sufficient to support the jury verdict.

Defendants cite *Farrar v. Bracamondes*, 332 F. Supp. 2d 1126, 1131 (N.D. Ill. 2004), to support their contention that Mendez's lack of medical or psychological treatment dooms her claim of severe distress. (DE 137 at 2). In *Farrar*, the district court judge granted summary judgment to defendants since the plaintiff failed to identify outrageous behavior or severe emotional distress. 332 F. Supp. 2d at 1131. Specifically, Defendants here cite *Farrar*'s finding that "[s]tress, nervousness, anxiety, and sleeplessness that do not require any medical treatment are not severe emotional distress." *Id.* (citing *Swanson v. Swanson*, 257 N.E.2d 194, 196 (Ill. App. Ct. 1970) and *Knierim v. Izzo*, 174 N.E.2d 157, 164 (Ill. 1961)). However, *Farrar* is distinguishable from this case because in *Farrar*, the plaintiff did not allege "severe emotional distress;" she claimed only to have suffered "some emotional distress." *Id.*, 332 F. Supp. 2d at 1131. Moreover, the plaintiff in *Farrar* did not present evidence of any major life disruption as a result of the defendants' conduct. *Id.* at 1129, 1131. In this case, Mendez claims she suffered severe emotional distress and has presented evidence that she stopped socializing and dropped out of school due to the harassment and the degradation she endured. Therefore, we deny Defendants' motion for judgment as a matter of law on the IIED claims.

# CONCLUSION

Based on the foregoing analysis, we grant Mendez's motion for liquidated damages under the FLSA in the amount of $6,750. We also conclude that the compensatory and punitive damages granted for Title VII sexual harassment are capped at $100,000. In addition, we deny Defendants' motion to reduce the punitive damages. Finally, we deny Defendants' motion for judgment as a matter of law on Mendez's intentional infliction of emotional distress claims.


Samuel Der-Yeghiayan
United States District Court Judge


Dated:   March 26, 2008